IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR19 |
| | ) | |
| v. | ) | |
| | ) | |
| ADU-ANSERE KWAME OKAI, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant is before the court for sentencing. This memorandum opinion supplements findings made on the record on June 29, 2005, Filing No. 24, and in the court's Statement of Reasons filed on this date.

### I. FACTS

The defendant was indicted and charged in a two-count indictment with possessing, passing and uttering falsely made, forged, counterfeited and altered obligations and other securities of the United States with intent to defraud on or about December 16, 2004, in violation of 18 U.S.C. § 472 (Count I), and knowingly possessing one or more identification documents that are or appear to be identification documents of the United States, which were produced without lawful authority, knowing that such identification documents were produced without lawful authority, on or about January 10, 2005, in violation of 18 U.S.C. § 1028(a)(6) (Count II). Filing No. 1.

Defendant entered a plea of guilty to Count I on April 13, 2005. Filing No. 17. The statutory range of imprisonment for that charge, possession of counterfeit obligations with intent to defraud, is zero to twenty years. 18 U.S.C. § 472. In his petition to enter a plea of guilty, defendant stated as the factual basis for his plea, "On 12/16/04, in Nebraska, I

passed counterfeited U.S. currency." *Id.* at 14.  There was no plea agreement in the case.

He subsequently entered a plea of guilty to Count II on July 26, 2005.  The statutory range

of imprisonment for possession of unlawful identification documents is zero to five years.

18 U.S.C. § 1028(a)(6) and (b).  In his petition to enter a plea of guilty, defendant indicated,

"[o]n 1/10/05 in Nebraska, I possessed an identification document that appeared to be an

identification document of the U.S.  I knew the document was not mine."  Filing No. 35,

Petition at 14.

A change of plea hearing was scheduled for April 5, 2005.  At that hearing,

defendant raised the issue of the amount of loss.  There is no plea agreement involved in

this case.  The hearing was continued to enable the parties to resolve the amount of loss

issue as well as other sentencing issues.  Filing No. 14.  The continued change of plea

hearing on Count I was held on April 13, 2005.  Filing No. 38, Transcript of Proceedings

on April 13, 2005 and June 29, 2005 ("Tr.").  At the hearing, it became clear that the parties

had been unable to agree to the amount of loss.  *Id.* at 4.  The government stated that

there was no plea agreement and "[t]here is no agreement as to the amount of counterfeit

bills and there is no agreement as to whether or not part of the crime was committed

outside of the United States." *Id.* at 4.  The government conceded that these facts were

"not pled and there is no supplemental [I]nformation to be filed." *Id.* at 5.  The government

contended nonetheless that its position was that the amount of fraud was over $14,000

and that part of the offense occurred outside the United States.  *Id.*

Defendant raised a due process challenge, contending that neither the amount of

loss nor the "foreign country" enhancement was pled in the indictment, admitted by

defendant, or proven beyond a reasonable doubt.  *Id.* at 3.  He characterized the issue as

2

one of notice and due process.  *Id.* at 20, 21, and 24.  Defendant stated that he was willing to admit that he passed some counterfeit money but that he was willing to stipulate only to an amount of $1,000 or less.  *Id.* at 5-6 "[a]s to the enhancements . . . he's pleading to count [I] . . . and he's pleading to the elements of that offense, and that's all he needs to do, and that no enhancements should be assessed upon him").

The court ascertained that the defendant's entry of a plea of guilty was knowing and voluntary, and then attempted to determine the nature of the government's evidence.  *Id.* at 14-15.  The government stated that an investigation of counterfeit $100 bills by the Secret Service had resulted in the questioning of Okai.  *Id.* at 15.  The government stated that Okai told Secret Service agents that he had purchased $4,500 in counterfeit Federal Reserve notes in Ghana which he brought back to the United States in January 2004.  *Id.* at 16.  The government also related that Okai also told the agent that he later wired $3,000 to Ghana in order to purchase $10,000 worth of counterfeit notes.  *Id.* at 17.  The record is not clear on whether or not those notes were ever received by Okai.  *Id.*

On questioning by the court, Okai did not admit the truth of the government's proffer. *Id.* at 19, 20 and 23.  Okai stated, through counsel, that he intended to plead guilty only to the elements of the crime alleged in the indictment.  *Id.* at 20.  He thus admitted that he passed counterfeit bills and that they had value, noting that "[t]he government has refused to file an [I]nformation or to give notice to Mr. Okai as to what is the amount they are claiming, and based upon that Mr. Okai entered a plea of guilty."  *Id.* at 24.  Defense counsel also stated, "[t]he fact that the defendant may have spoken to law enforcement I don't think has anything to do with his Sixth Amendment right to have a trial in  reference

3

to the amount of money and the burden of proof of the government to prove that beyond a reasonable doubt." *Id.* at 20.

The court accepted defendant's plea of guilty to Count I of the indictment, and reserved ruling on the issue of amount of loss. *Id.* at 24. The court offered to hold an evidentiary hearing with respect to the amount of loss, requested briefing on the issue and set the date for the sentencing hearing on June 29, 2005. *Id.* at 22-23 (stating "[s]o I'm willing to have a trial on the issue of the quantity of the money . . . I'll schedule that for hearing as part of the sentencing, because I think that that flows from the elements of the crime . . . unless you two come up with an agreement on how much money your client is supposed to be held responsible for . . . then we are going to have a hearing on that and that hearing has to be proved beyond a reasonable doubt to this court").

A presentence investigation report ("PSR") was prepared by the United States Probation Office ("probation office") with respect to Count I and was distributed to the parties. In the PSR, the probation office determined that the base offense level for a violation of 18 U.S.C. § 472 was 9 under U.S.S.G. § 2B5.1(a). The probation office then added four levels to the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(c), which provides for incremental increases to losses over $5,000, resulting in a base offense level of 13. The probation office determined that defendant should be held responsible for losses in the amount of $14,000. The probation office added an additional two-level increase under U.S.S.G. § 2B5.1(b)(5), which provides for such an enhancement if any part of the crime was committed outside of the United States.[1] After a deduction of 2

---

[1]These enhancements were based on Okai's alleged statements to law enforcement officers, as recounted to the probation officer by the prosecutor.

points for acceptance of responsibility, Okai's resulting total offense level was determined to be 13. The probation office then determined that Okai's Criminal Offense Level should be II, with 2 points assessed for a conviction for fraudulent use of a Social Security number. See U.S.S.G. § 4A1.1(b). The probation office accordingly calculated Okai's guideline sentencing range on Count I to be 15 to 21 months.

At the sentencing hearing, the government accepted and adopted the PSR. Tr. at 27. The defendant objected to the PSR's calculation of the amount of loss and to the two-level enhancement for commission of part of the crime outside the United States. *Id.* at 28. Defendant specifically objected to the finding in the PSR that established an amount of loss over $800 and to the finding that part of the crime had been committed outside of the United States. *Id.* The defendant took the position that he pled guilty only to passing counterfeit currency on or about the 16th day of December, 2004, and the amount of loss should be limited to the amount of counterfeit bills he passed on that day. *Id.* Defendant made specific reference to *Blakely*, *Booker*, and *Apprendi* in connection with his objections. *Id.* at 33. Defense counsel stated that those cases establish that a defendant "still needs to be given notice and that the standard of proof is beyond a reasonable doubt in matters that are not admitted by the defendant." *Id.* at 34-35.

The government requested that the court impose a sentence calculated under the Guidelines to include the enhancements to which defendant had objected, resulting in a total offense level of 13. *Id.* at 31. The government presented no evidence on either the amount of loss or the foreign location of the crime. It contended that "the use of the phrase 'on or about' that date [in the indictment] doesn't simply limit it to that date . . . use of the

phrase 'on or about' would include any relevant conduct to that particular type of activity." *Id.* at 33.

The court noted that the only thing that Okai "pled guilty to was to counterfeiting on December 16th, 2004 . . . for $800 . . . and it seems to me that's the base offense level." *Id.* at 32.  The court further noted that although Okai "confessed to most all of this, but it's not part of count one of the indictment," and that nothing prevented the government "from filing indictments on each one of the counts that he confessed to, but count one is all that he has pled guilty to and count one only is limited to December 16th, 2004." *Id.* Accordingly, the court sustained defendant's objections to the PSR and determined that defendant's base offense level was 9, arriving at a total offense level of 7 after subtracting two levels for acceptance of responsibility.  The court determined that OAI's criminal history category was 2 and that his guideline sentencing range was two to eight months.  The court sentenced Okai to a term of eight months on Count I.

Count II was set for trial, but defendant filed a petition to enter a plea of guilty to that count as well.  See Filing No. 35.  Although a PSR was not prepared in connection with that count, both parties agreed to the probation office's calculation that the sentencing range for the offense of possessing false identification documents was one to seven months and that the sentence should be concurrent to the sentence imposed on Count I. Okai was accordingly sentenced to seven months on Count II, to be served concurrently to his sentence on Count I.

## II.  DISCUSSION

### A.  Sentencing Procedure

6

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court invalidated the United States Sentencing Guidelines ("Guidelines") to the extent that they were applied as mandatory. *Id.* at 764. Accordingly, the Guidelines are advisory and sentences are subject to appellate review for "reasonableness." *Id.* at 757, 765-66 (Breyer, J., opinion of the Court) ("remedial majority opinion"). In imposing a sentence post-*Booker*, this court must follow certain prescribed sentencing procedures. *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005); *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005). It must continue to determine the appropriate Guidelines sentencing range, since that range is an important factor to be considered in the imposition of a sentence. *Id.* Once the applicable range is determined, the court should then decide if a traditional departure is appropriate under Part K and/or § 4A1.3 of the Guidelines. *Id.* at 1002. However, "[because the guidelines are now advisory, a reasonable departure is not limited solely to circumstances that the formerly mandatory guidelines framework would have deemed permissible bases for departure." *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005) (stating that *Booker* excised the narrow prescription for when departures are warranted). However, a sentence imposed that includes a formerly permissible departure will be "consistent with the now-advisory Guidelines and this is generally indicative of reasonableness." *United States v. Shannon*, No. 04-2895, Slip op. at 6 (8th Cir. July 14, 2005). Those considerations will result in a "Guidelines sentence." *Haack,* 403 F.3d at 1002.

The court then considers the factors set forth in § 3553(a) to determine whether to impose the Guidelines sentence or a non-Guidelines sentence. *Id.* The court must consider the need for the sentence imposed to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, the court must consider the kinds of sentence available and the applicable category of offenses and category of defendant as set forth in the Guidelines and its policy statements, as well as the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(3)-(6).

The Guidelines range is thus one of many factors for the sentencing court to consider, and although the court is not bound by the Guidelines, it must consult them and take them into account when sentencing.  *Id.* at 767, 790 (Scalia, J., dissenting); *see United States v. Winters*, No. 04-3210, slip op. at 9 (8th Cir. Aug 8, 2005) (noting that reasonableness "must be based on *all* the factors listed in § 3553(a)(6)" and that a possible sentencing disparity, as measured by the Guidelines sentence, must not be isolated "to the exclusion of all the other § 3553(a) factors") (emphasis in original).  Indeed, a finding that "the range of reasonableness is essentially co-extensive with the Guidelines would effectively render the Guidelines mandatory."  *See United States v. Winters*, No 04-3210, slip op. at 6 n.4 (8th Cir. Aug. 8, 2005) (stating that reasonableness is to be determined by the district court in the first instance).

## B.  Determination of Guidelines Range

To satisfy the Sixth Amendment concerns addressed in *Booker*, this court is now charged under the Sentencing Reform Act with the duty to "impose a sentence sufficient,

but not greater than necessary," to comply with sentencing purposes and to "consider the nature and circumstances of the offense and the history and characteristics of the defendant" in determining a reasonable sentence.  *See* 18 U.S.C. § 3553(a)(1).  Nothing in *Booker* requires the court to determine the appropriate Guidelines sentencing range in any manner other than the way the sentence would have been determined pre-*Booker*.[2] *Haack,* 403 F.3d at 1002.  The first step in application of the Guidelines is determining which offense guideline section covers the offense of conviction.  *See* U.S.S.G. § 1B1.2(a); *United States v. Casey*, 158 F.3d 993, 995 (8th Cir. 1998); *United States v. Street*, 66 F.3d 969, 979 (8th Cir.1995).  "The offense guideline section is the foundation of the sentence." *See Casey*, 158 F.3d at 995; *United States v. Saavedra*,148 F.3d 1311, 1314 (11th Cir. 1998).  Because it channels the remainder of the sentencing process, selection of the correct offense guideline section is critically important.  *Casey*, 153 F.3d at 996.

In order to correctly determine the applicable offense guideline, a sentencing court must identify "the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction."  U.S.S.G. § 1B1.2(a); *Casey*, 153 F.3d at 996. *See also United States v. Martinez-Noriega,* 2005 WL 1797506 at *2 (8th Cir. Aug. 8, 2005).  The offense of conviction is defined as "the offense conduct charged in the count of the indictment or information of which the defendant was convicted."  U.S.S.G. § 1B1.2(a); *Casey*, 153 F.3d at 995.  The sentencing court is directed to "use the guideline section from Chapter Two most applicable to the offense of conviction" and advised that "[t]he Statutory Index (Appendix A) provides a listing to assist in this determination."

---

[2]As discussed later in this opinion, *Booker* does not address Fifth Amendment concerns.

U.S.S.G. § 1B1.2, comment. (n.1).  That listing cross-references federal statutory offenses to the various guideline sections.[3]  *See* U.S.S.G. App. A.

"'Base offense level' is a term of art used in Chapter Two of the guidelines." *Martinez-Noriega*, 2005 WL 1797506 at *2 (noting that each offense has a corresponding base offense level and may have one or more specific offense characteristics that adjust the offense level upward or downward).  *Id.*  In the plea agreement context, in securing an agreement to be held responsible for a certain base offense level, "a defendant has solidified where he will start in Chapter Two of the guidelines."  *Id.*

There is "one limited exception to the general rule that the offense conduct for guideline purposes is that charged in the indictment: 'Provided, however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two most applicable to the stipulated offense.'" *Casey,* 153 F.3d at 996 (quoting U.S.S.G. § 1B1.2(a)).  The Commentary following Section 1B1.2. explains, "for example, if the defendant pleads guilty to theft, but admits elements of robbery as part of the plea agreement, the robbery guideline is to be applied," but only to the extent of the maximum sentence for theft.  U.S.S.G. § 1B1.2, comment. (n.3).  "A factual statement or a stipulation contained in a plea agreement (written or made orally on the record) is a stipulation for purposes of [application of the provision that the defendant stipulates to a more serious offense] only if both the defendant and the government explicitly agree that the factual statement or stipulation is a stipulation for such purposes."

---

[3]For example, Okai was charged with violating 18 U.S.C. §§  472 and 1028(a)(6). In Appendix A, those statutes are cross referenced to U.S.S.G. §§ 2B1.1, 2B5.1, 2L2.1 and 2L2.2). *See* U.S.S.G. App. A.

U.S.S.G. § 1B1.2, comment. (n.1).  Thus, "stipulations to additional offenses are treated as if the defendant had been convicted of separate counts charging those offenses." U.S.S.G. § 1B1.2(a); *United States v. Collar*, 904 F.2d 441, 442 (8th Cir. 1990).  The provision, however, has not been interpreted "to mean that whenever a criminal defendant's total criminal conduct includes some acts that would constitute an offense more serious than the offense of conviction, the guideline for the more serious offense may be used."  *See Casey*, 153 F.3d at 996.

The Guidelines articulate several policies that govern the quality and specificity of plea agreements for acceptance by the court.  *See* U.S.S.G. § 6B1.2 (listing standards for acceptance of plea agreement).  The PSR is not evidence and is not legally sufficient for making findings of fact on contested issues. *United States v. Mesner*, 377 F. 849, 853 (8th Cir. 2004) (noting that when "a timely objection to the PSR is made, the sentencing court may not rely solely on the PSR when making a finding as to the disputed facts but must do so on the basis of evidence").

### C.  Constitutional Objections

The Sixth Amendment is violated if a sentencing judge imposes a sentence under the Guidelines based on the determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant.  *United States v. Booker,* 125 S. Ct. 738, 746 (2005) (Stevens, J., opinion of the Court) ("substantive majority opinion") (finding that *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and *Apprendi v. New Jersey,* 530 U.S. 466, 477 (2000), apply to the United States Sentencing Guidelines).  A defendant, of course, is free to waive his right to a jury trial and to consent to factfinding by the court.  *See Blakely*, 124 S. Ct. at 2541 (noting that "when a defendant pleads guilty,

11

the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding"); *Duncan v. Louisiana*, 391 U.S. 145, 158 (1968); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).  Defendant has done so in this case, so the defendant's right to a jury trial is not at issue.

Rather, the issue before the court is whether, and under what standard of proof, the court can determine facts at sentencing so as not to offend a defendant's Fifth Amendment right to due process.[4]  A Fifth Amendment challenge involves a constitutional protection "of surpassing importance:  the proscription of any deprivation of liberty without 'due process of law.'"  *Apprendi v. New Jersey,* 530 U.S. 466, 477 (2000).  It provides that a criminal defendant is entitled to a determination that he is guilty of every element of the crime with which he is charged beyond a reasonable doubt.  *Id.* at 477.  The entitlement to proof beyond a reasonable doubt is as "equally well-founded" as the right to a jury determination. *Id.* at 478 (noting that "[t]he 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times . . . [and] is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt'" (quoting *In re Winship*, 397 U.S. 358, 361, (1970)). The reliance on the "reasonable doubt" standard reflects a profound judgment about the way in which laws should be enforced and justice administered.  *Id.*  It has a vital role in

---

[4]The *Booker* decision has been interpreted to establish that "but for the mandatory nature of the Guidelines, fact-findings by the district court will not offend the Sixth Amendment."  *United States v. Ryder*, No. 03-3478/79, 2005 WL 1639460 (8th Cir. July 14, 2005).  Whether such facts pass muster under the Fifth Amendment is a different question.  In *Booker,* the Supreme Court carefully limited its holding to the Sixth Amendment right to jury trial and did not address the requirement of proof beyond a reasonable doubt which has its roots in the Fifth Amendment's Due Process Clause. *See Booker,* 125 S. Ct. at 798 n.6 (Thomas, J., dissenting in part) ("[t]he Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by a jury or admitted by defendant.").  *Booker* does not address the due process constraints on sentencing.

12

our criminal procedure for cogent reasons—prosecution subjects a criminal defendant both to possible loss of liberty and to certain stigma. See *id.* at 484. The procedural protection of a reasonable doubt standard is thus required "in order to 'provide concrete substance for the presumption of innocence,' and to reduce the risk of imposing such deprivations erroneously." *Id.* Indeed, use of the beyond-a-reasonable-doubt standard reflects society's belief that the defendant's interests are so great that the state should bear the risk of error. *See Bullington v. Missouri*, 451 U.S. 430, 440-41 (1981).

The Due Process Clause is implicated whenever a judge determines a fact by a standard lower than "beyond a reasonable doubt" if that factual finding would increase the punishment above the lawful sentence that could have been imposed absent that fact.[5] *Apprendi*, 530 U.S. at 494. To the extent that making the Guidelines advisory obviates Constitutional concerns, there are distinctions to be drawn between Fifth Amendment and Sixth Amendment protections. *See United States v. Pimental*, 367 F. Supp. 2d 143, 152 (D. Mass. 2005) (stating that "even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is"). *See also Booker*, 125 S. Ct. at 799 (Thomas, J., concurring in substantive majority opinion, dissenting to remedial majority opinion) (stating that the substantive majority opinion "corrects the [Sentencing Commission's] mistaken belief," set forth in U.S.S.G. § 6A1.3, that "use of a preponderance of the

---

[5]*Cf. United States v. Pirai*, 406 F.3d 543, 551 n.4 (8th Cir. 2005) (en banc) (noting that *Booker* does not require that sentencing judges find sentence-enhancing facts beyond a reasonable doubt). As noted, *Booker's* remedial opinion simply does not involve the Fifth Amendment issue. Moreover, the defendant in *Pirai* had not preserved the issue by raising an *Apprendi* objection. *Id.* at 549.

evidence standard is appropriate to meet due process concerns and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

In *Apprendi*, the Court held that the existence of "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court defined the "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 124 S. Ct. at 2537 (emphasis in original). "The relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.,* 124 S. Ct. at 2537 (emphasis in original). *Blakely* thus broadened *Apprendi* by requiring that "all facts 'which the law makes essential to the punishment'" be subject to constitutional protections. *Blakely*, 124 S. Ct. at 2537 (quoting 1 J. Bishop, Criminal Procedure § 87 (2d ed. 1872)); *see United States v. Malouf*, 2005 WL 1398624 (D. Mass. 2005). Any contention that by making the Guidelines merely advisory, the maximum sentence faced by a defendant again becomes the statutory maximum set forth in the United States Code would contravene *Blakely*. *Blakely,* 124 S. Ct. at 2537; *Ring v. Arizona*, 536 U.S. 584, 602 (2002). Indeed, in *Booker*, use of the modifier "statutory" with reference to "maximum" was abandoned altogether. *See Booker,* 125 S. Ct. at 752 (substantive majority opinion) (explaining that use of the term "statutory maximum" in *Apprendi* was necessitated by the fact that a statute was under consideration in the case).

Under *Apprendi*, the point at which constitutional safeguards attach to a sentence imposed within a broad discretionary range is the point at which the sentence exceeds "the

limits fixed by law." *Apprendi*, 530 U.S. at 566 n.9 (stating that a judge may "not impose a more severe sentence than that authorized by the facts found [beyond a reasonable doubt] by a jury"). Under the advisory Guidelines scheme, a "reasonable sentence," as determined by the interplay of the United States Code, the Sentencing Reform Act, the now-advisory Sentencing Guidelines, and evolving circuit court sentencing directives, now defines "the limits set by law." It cannot be seriously argued that the Sentencing Guidelines do not continue to have a large, if not determinative, effect on sentencing. *See Shannon*, No. 04-2895, slip op. at 6 (a departure formerly permissible under the mandatory Guidelines is "generally indicative of reasonableness"); *Haack*, 403 F.3d at 1002 (noting the Guidelines continue to "play a role" in sentencing); *United States v. Mykytiuk,* 2005 WL 1592956 (7th Cir. July 7, 2005) (holding that the Guidelines remain an "essential tool" in sentencing and that a properly calculated Guidelines sentence is entitled to a rebuttable presumption of reasonableness).

In contrast to the pre-Guidelines sentencing regime, a sentencing court's discretion is limited post-*Booker*. *Compare United States v. Brenneman*, 918 F.2d 745, 746 (8th Cir. 1990) (holding that a sentence imposed within the applicable statutory limits was generally not subject to review on appeal, and would be reviewed only for manifest or gross abuse of discretion such that the severity of the sentence "shocks the judicial conscience"), *with Booker,* 125 S. Ct. at 750 (substantive majority opinion) (noting that no *Apprendi* problem arises when a district judge is bound only by the statutory maximum with no prospect of reversal for imposition of a sentence within that range), and *Booker,* 125 S. Ct. at 765-66 (remedial majority opinion) (prescribing appellate review for reasonableness). Thus, it remains true after *Blakely* and *Booker* that "a judge's role in sentencing is constrained at

its outer limits by *the facts alleged in the indictment* and found by the jury," or by a judge,

with defendant's consent to judicial factfinding.  *See Apprendi*, 430 U.S. at 483 n.10.

A defendant's entry of a plea of guilty and concomitant waiver of a jury trial cannot

correspondingly constitute a waiver of the burden placed on the government to prove its

case.  *See Schriro v. Summerlin*, 124 S. Ct. 2519, 2523 (2004) (finding the jury-trial

guarantee enunciated in *Ring,* 536 U.S. 584, is not retroactive because judicial

determinations made beyond a reasonable doubt are sufficiently reliable); *see also*

*Boykin*, 395 U.S. at 243 (stating that pleading guilty implicates the Fifth Amendment

privilege against self-incrimination, the Sixth Amendment right to confront one's accusers,

and the Sixth Amendment right to trial by jury with no mention of the burden of proof);

*Patterson v. New York*, 432 U.S., at 215, 97 S. Ct. at 2329 ("[A] State must prove every

ingredient of an offense beyond a reasonable doubt and . . . may not shift the burden of

proof to the defendant by presuming that ingredient upon proof of the other elements of

the offense"); *Sandstrom v. Montana,* 442 U.S. 510, 520-524 (1979).  Accordingly, the

burden of proof is not the defendant's to waive:

> [Use of the reasonable-doubt standard is indispensable to command the
> respect and confidence of the community in applications of the criminal
> law.  It is critical that the moral force of the criminal law not be diluted by a
> standard of proof that leaves people in doubt whether innocent men are
> being condemned.

*In re Winship*, 397 U.S. 358, 364 (1970) (noting the importance "in a free society that every

individual going about his ordinary affairs have confidence that the Government cannot

adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt

with utmost certainty"); *see also Neder v. United States,* 527 U.S. 1, 11, 13-15 (1991)

(holding that failure to instruct the jury that the State must prove the elements of an offense

beyond a reasonable doubt vitiates all the jury's findings whereas a failure to instruct on one element of an offense would not); *Victor v. Nebraska*, 511 U.S. 1 (1994) ("The Due Process Clause requires the government to prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires."); *Sullivan v. Louisiana*, 508 U.S. 275, 278, 282-83 (1993) (discussing the relationship between the Fifth and Sixth Amendment and stating that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt;" finding an erroneous burden-of-proof instruction is structural error not subject to harmless error review); *Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991) ("[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense"); *Jackson v. Virginia*, 443 U.S. 307 (1979) (finding the *Winship* doctrine, "establishing so fundamental a substantive constitutional standard, must also require that the factfinder will rationally apply that standard to the facts in evidence")*; Patterson v. New York*, 432 U.S. at 215 (1977) (recognizing a limit on state authority to reallocate traditional burdens of proof).

The difference between an individual's right to a jury and the societal right to an appropriate standard of proof is further illustrated by the difference in the way deprivations of each are treated on appeal and on collateral review. Although a misallocation of factfinding responsibility (judge versus jury) does not warrant retroactive application, *Schriro*, 124 S. Ct. at 2523, the same cannot be said for the retroactivity of application of a preponderance of evidence standard as opposed to a reasonable doubt standard. *See Hankerson v. North Carolina*, 432 U.S. 233 (1977) (giving retroactive effect to rule requiring

17

proof of all elements of crime beyond a reasonable doubt and voiding presumptions that shift the burden of proof to defendant); *Ivan v. City of New York*, 407 U.S. 203, 205 (1972) (holding that the purpose of a reasonable doubt standard is "to overcome an aspect of a criminal trial that impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect"). Application of a lower standard of proof may be an error that significantly affects factfinding accuracy and undermines society's confidence in the result of the trial.[6]  *See Schiro*, 128 S. Ct. at 2523.

The limits of due process have historically been defined with reference to the line that separates an element of a crime from a sentencing factor.  *See, e.g., Castillo v. United States,* 530 U.S. 120, 124-25 (2000) (finding that references to particular firearm types in gun statute defined a separate crime as opposed to simply authorizing an enhanced penalty and noting that "[t]raditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (e.g., that the defendant abused a position of trust or brandished a gun)"; whereas, "the length and severity of an added mandatory sentence that turns on [a fact] weighs in favor of treating such offense-related words as referring to an element").  *See also Mullaney v. Wilbur,* 421 U.S. 684, 698-703 (1975) (finding a due process violation in shifting the burden of proof to defendant to negate a  fact "critical to criminal culpability"); *Booker*, 125 S. Ct. at 755 (substantive majority opinion) (addressing sentencing factor/element distinction and identifying constitutional safeguards as formality of notice,

---

[6]*Schiro* addressed only the allocation of factfinding responsibility between the judge and jury. *United States v. Siegelbaum*, 359 F. Supp. 2d 1104, 1107 (D. Or. 2005).  There is a second component to *Blakely/Booker* that *Schiro* did not address, namely, that facts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt rather than by a preponderance the evidence.  *Id.*

18

identity of factfinder and the burden of proof); *Blakely,* 124 S. Ct. 2537 n.5; *Apprendi,* 530 U.S. at 494; *Harris v. United States,* 536 U.S. at 552-53 (2002); *Jones v. United States,* 526 U.S. 227, 233 (1999) (explaining that it is "at best questionable whether the specification of facts sufficient to increase a penalty by two-thirds, let alone from 15 years to life, was meant to carry none of the due process safeguards that elements of an offense bring with them for a defendant's benefit"); *United States v. Harris*, 397 F.3d 404, 413 (6th Cir. 2005) (finding that judicial determination of the type of firearm for an enhancement under 18 U.S.C. § 924(c) violates the constitution).  Even with respect to the traditional sentencing factor of a prior conviction, a sentencing court can only rely on the prior convictions as predicates for an increased sentence if the characteristics of these convictions are evidenced by "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."  *United States v. Shepard*, 125 S. Ct. 1254, 1257 (2005) (rejecting contention that sentencing court could look at police reports to determine nature of prior conviction).

Whether characterized as "elements" or not, certain facts, such as drug quantity, scope of the operation, amount of loss, or injury are as important to the sentence as the general elements of a crime set out in the criminal code.  See, e.g., *United States v. Malouf*, 2005 WL 1398624 at *11.  Moreover, these are factors that typically relate to the offense rather than to characteristics of the offender.  *See id.*  Even under the advisory Guidelines, some facts will be determinative in that they drive the calculation of the base offense level.  *See id.* (noting that in drug prosecutions, "quantity is all, despite the fact that it may well depend on variables that have nothing to do with the real scope of the offense,

or defendant's role in it (e.g., how long the government happened to have surveilled the defendant, how explicit a co-defendant was about amounts, etc.)").

These facts "figure so prominently in the sentencing decision that the decisionmaker should have a high degree of confidence in the fact." *Id.*; *United States v. Gray*, 362 F. Supp.2d 714, 723 (S.D. W. Va. 2005) ("As a tool for reducing the risk of error, reasonable doubt retains its usefulness in the advisory regime.").  Under the circumstances, the court finds that it should err on the side of caution in protecting a criminal defendant's constitutional rights.  The principal of constitutional avoidance mandates that the federal sentencing statutes should be construed to avoid the difficult constitutional question of whether the imposition of a harsher sentence—whether characterized as a Guidelines sentence, a departure, or a deviance—violates due process when the greater punishment is based on facts found under a standard lower than proof beyond a reasonable doubt. *See Clark v. Suarez-Martinez*, 125 S. Ct. 716, 724 (2005) (a court should construe a statute to avoid a constitutional infirmity if possible).  Moreover, whatever the constitutional limitations on the advisory sentencing scheme, the court finds that it is not "reasonable" to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt.  S*ee Ring v. Arizona,* 536 U.S. 584, 592-93 and n.1 (2002) (holding that any fact essential to imposition of the death penalty must be submitted to a jury and found beyond a reasonable doubt); *Apprendi,* 530 U.S. at 477 (2000) (finding a sentence violates the right to "a jury determination that [the defendant] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); *Jones v. United States*, 526 U.S. at 243 n.6 (1999) (holding that the carjacking statute, if construed as defining a single crime with three maximum penalties instead of three distinct offenses

20

would violate the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment).

### D.  Application to this Case

In determining the appropriate guideline range in this type of case, the determination of amount of loss is a critical determination.  The base offense level for a counterfeiting crime gradually increases by the amount of financial loss attributable to the defendant.  U.S.S.G. § 2B1.1(b)(1).  This determination must be made in the first instance by facts either admitted by defendant or proven beyond a reasonable doubt.

Generally, the amount of loss to be considered is the defendant's intended, rather than actual, loss, if an intended loss can be determined, and if the intended loss exceeds the amount of actual loss. U.S.S.G. § 2B1.1 comment. n.3(A).  To calculate intended loss, the district court is to make only a reasonable estimate of the loss, in consideration of the sentencing judge's "unique position to assess the evidence and estimate the loss based on that evidence."  U.S.S.G. § 2B1.1 comment. n. 3(C).

Notably, the indictment did not allege any conspiracy or scheme to defraud.  The offense with which Okai was charged, does not have a scheme, conspiracy, or pattern of criminal activity as an element. *See* 18 U.S.C. § 472; *see also United States v.  Fogg*, 409 F.3d 1022, 1028 (8th Cir. 2005) (involving restitution).  The indictment alleged, and defendant admitted, that he passed counterfeit currency on one occasion.  Okai admitted in the plea colloquy that the amount of currency he passed on that occasion was less than $1,000.  He disputed the government's contention that it had evidence of additional losses.  He disputed the findings in the PSR.  The government failed to present any evidence with respect to the controverted facts.

21

The court finds that Okai cannot be sentenced, consistent with due process, to a term of imprisonment for causing an amount of loss that exceeds the extent of the indictment and his admissions.[7]  In the related context of restitution, unless the charged offense has a scheme, conspiracy, or pattern of criminal activity as an element, the restitution order may only cover losses from the specific offense for which the defendant was indicted and convicted. *United States v. Ramirez*, 196 F.3d 895, 899-900 (8th Cir. 1999).  Accordingly, the court sustains defendant's objections to the PSR and finds that defendant's advisory guideline sentence is limited to the sentence that can be imposed based on facts alleged in the indictment, proved beyond a reasonable doubt or admitted by defendant.

The court will next determine whether the sentence is reasonable under *Booker's* remedial scheme, mindful that "[i]n fulfilling its duty to impose a sentence sufficient, but not greater than necessary, to comply with sentencing purposes," the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  *See* 18 U.S.C. § 3553(a)(1); *see also Booker*, 125 S. Ct. at 766-67 (remedial majority opinion).  The court has considered the need for the sentence imposed: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant

---

[7]Eighth Circuit precedent does not mandate a contrary result.  *See United States v. Crawford*, 414 F.3d 980 (8th Cir. 2005) (affirming a twelve-level enhancement for amount of loss as based on <u>admitted</u> facts); *United States v. Radke*, 415 F.3d 826 (8th Cir. 2005) (affirming an amount of loss reasonably foreseeable to acts of co-workers in furthering a scheme to defraud); *United States v. Carter*, 412 F.3d 864 (8th Cir. 2005) (affirming loss determination under plain error review); *United States v. Parsons*, 408 F.3d 519, 521 (8th Cir. 2005) (affirming twelve-level enhancement for amount of loss where defendant <u>admitted</u> amount in plea agreement).  Significantly, none of these cases involves a properly preserved Fifth Amendment challenge involving disputed facts.

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). In addition, the court has considered, as advisory, the kinds of sentence available and the applicable category of offenses and category of defendant as set forth in the United States Sentencing Guidelines, and any policy statements promulgated thereto. 18 U.S.C. § 3553(a)(2). Also, the court has considered the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(6) & (7). These factors can generally be grouped into three categories: the nature of the offense; the history of the defendant; and the needs of the public and victims. As noted above, the court has consulted the Guidelines and has determined that defendant's Guidelines sentence should be eight months.

The court also notes that the defendant will likely be deported. The court's experience is that the deportation process will likely take an additional six to eight months from the date of his Bureau of Prisons' release, during which time the defendant will remain incarcerated. Given the totality of the circumstances, the court finds this sentence will fulfill the objectives noted above.

A Statement of Reasons and Judgment and Conviction in conformity with this Memorandum Opinion will issue this date.

DATED this 22nd day of August, 2005.

BY THE COURT:


s/ Joseph F.  Bataillon
JOSEPH F.  BATAILLON
United States District Judge

23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR19 |
| | ) | |
| v. | ) | |
| | ) | |
| ADU-ANSERE KWAME OKAI, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant is before the court for sentencing.   This memorandum opinion supplements findings made on the record on June 29, 2005, Filing No. 24, and in the court's Statement of Reasons filed on this date.

## I.  FACTS

The defendant was indicted and charged in a two-count indictment with possessing, passing and uttering falsely made, forged, counterfeited and altered obligations and other securities of the United States with intent to defraud on or about December 16, 2004, in violation of 18 U.S.C. § 472 (Count I), and knowingly possessing one or more identification documents that are or appear to be identification documents of the United States, which were produced without lawful authority, knowing that such identification documents were produced without lawful authority, on or about January 10, 2005, in violation of 18 U.S.C. § 1028(a)(6) (Count II).  Filing No. 1.

Defendant entered a plea of guilty to Count I on April 13, 2005.  Filing No. 17.  The statutory range of imprisonment for that charge, possession of counterfeit obligations with intent to defraud, is zero to twenty years.  18 U.S.C. § 472.  In his petition to enter a plea of guilty, defendant stated as the factual basis for his plea, "On 12/16/04, in Nebraska, I

passed counterfeited U.S. currency." *Id.* at 14.  There was no plea agreement in the case.

He subsequently entered a plea of guilty to Count II on July 26, 2005.  The statutory range

of imprisonment for possession of unlawful identification documents is zero to five years.

18 U.S.C. § 1028(a)(6) and (b).  In his petition to enter a plea of guilty, defendant indicated,

"[o]n1/10/05 in Nebraska, I possessed an identification document that appeared to be an

identification document of the U.S.  I knew the document was not mine."  Filing No. 35,

Petition at 14.

A change of plea hearing was scheduled for April 5, 2005.  At that hearing,

defendant raised the issue of the amount of loss.  There is no plea agreement involved in

this case.  The hearing was continued to enable the parties to resolve the amount of loss

issue as well as other sentencing issues.  Filing No. 14.  The continued change of plea

hearing on Count I was held on April 13, 2005.  Filing No. 38, Transcript of Proceedings

on April 13, 2005 and June 29, 2005 ("Tr.").  At the hearing, it became clear that the parties

had been unable to agree to the amount of loss.  *Id.* at 4.  The government stated that

there was no plea agreement and "[t]here is no agreement as to the amount of counterfeit

bills and there is no agreement as to whether or not part of the crime was committed

outside of the United States." *Id.* at 4.  The government conceded that these facts were

"not pled and there is no supplemental [I]nformation to be filed." *Id.* at 5.  The government

contended nonetheless that its position was that the amount of fraud was over $14,000

and that part of the offense occurred outside the United States.  *Id.*

Defendant raised a due process challenge, contending that neither the amount of

loss nor the "foreign country" enhancement was pled in the indictment, admitted by

defendant, or proven beyond a reasonable doubt.  *Id.* at 3.  He characterized the issue as

2

one of notice and due process. *Id.* at 20, 21, and 24.  Defendant stated that he was willing

to admit that he passed some counterfeit money but that he was willing to stipulate only

to an amount of $1,000 or less.  *Id.* at 5-6 "[a]s to the enhancements . . . he's pleading to

count [I] . . . and he's pleading to the elements of that offense, and that's all he needs to

do, and that no enhancements should be assessed upon him").

    The court ascertained that the defendant's entry of a plea of guilty was knowing and

voluntary, and then attempted to determine the nature of the government's evidence. *Id.*

at 14-15.  The government stated that an investigation of counterfeit $100 bills by the

Secret Service had resulted in the questioning of Okai.  *Id.* at 15.  The government stated

that Okai told Secret Service agents that he had purchased $4,500 in counterfeit Federal

Reserve notes in Ghana which he brought back to the United States in January 2004.  *Id.*

at 16.  The government also related that Okai also told the agent that he later wired $3,000

to Ghana in order to purchase $10,000 worth of counterfeit notes.  *Id.* at 17.  The record

is not clear on whether or not those notes were ever received by Okai.  *Id.*

    On questioning by the court, Okai did not admit the truth of the government's proffer.

*Id.* at 19, 20 and 23.  Okai stated, through counsel, that he intended to plead guilty only to

the elements of the crime alleged in the indictment.  *Id.* at 20.  He thus admitted that he

passed counterfeit bills and that they had value, noting that "[t]he government has refused

to file an [I]nformation or to give notice to Mr. Okai as to what is the amount they are

claiming, and based upon that Mr. Okai entered a plea of guilty."  *Id.* at 24.  Defense

counsel also stated, "[t]he fact that the defendant may have spoken to law enforcement I

don't think has anything to do with his Sixth Amendment right to have a trial in reference

to the amount of money and the burden of proof of the government to prove that beyond a reasonable doubt." *Id.* at 20.

The court accepted defendant's plea of guilty to Count I of the indictment, and reserved ruling on the issue of amount of loss. *Id.* at 24. The court offered to hold an evidentiary hearing with respect to the amount of loss, requested briefing on the issue and set the date for the sentencing hearing on June 29, 2005. *Id.* at 22-23 (stating "[s]o I'm willing to have a trial on the issue of the quantity of the money . . . I'll schedule that for hearing as part of the sentencing, because I think that that flows from the elements of the crime . . . unless you two come up with an agreement on how much money your client is supposed to be held responsible for . . . then we are going to have a hearing on that and that hearing has to be proved beyond a reasonable doubt to this court").

A presentence investigation report ("PSR") was prepared by the United States Probation Office ("probation office") with respect to Count I and was distributed to the parties. In the PSR, the probation office determined that the base offense level for a violation of 18 U.S.C. § 472 was 9 under U.S.S.G. § 2B5.1(a). The probation office then added four levels to the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(c), which provides for incremental increases to losses over $5,000, resulting in a base offense level of 13. The probation office determined that defendant should be held responsible for losses in the amount of $14,000. The probation office added an additional two-level increase under U.S.S.G. § 2B5.1(b)(5), which provides for such an enhancement if any part of the crime was committed outside of the United States.[1] After a deduction of 2

---

[1]These enhancements were based on Okai's alleged statements to law enforcement officers, as recounted to the probation officer by the prosecutor.

points for acceptance of responsibility, Okai's resulting total offense level was determined to be 13. The probation office then determined that Okai's Criminal Offense Level should be II, with 2 points assessed for a conviction for fraudulent use of a Social Security number. See U.S.S.G. § 4A1.1(b). The probation office accordingly calculated Okai's guideline sentencing range on Count I to be 15 to 21 months.

At the sentencing hearing, the government accepted and adopted the PSR. Tr. at 27. The defendant objected to the PSR's calculation of the amount of loss and to the two-level enhancement for commission of part of the crime outside the United States. *Id.* at 28. Defendant specifically objected to the finding in the PSR that established an amount of loss over $800 and to the finding that part of the crime had been committed outside of the United States. *Id.* The defendant took the position that he pled guilty only to passing counterfeit currency on or about the 16th day of December, 2004, and the amount of loss should be limited to the amount of counterfeit bills he passed on that day. *Id.* Defendant made specific reference to *Blakely*, *Booker*, and *Apprendi* in connection with his objections. *Id.* at 33. Defense counsel stated that those cases establish that a defendant "still needs to be given notice and that the standard of proof is beyond a reasonable doubt in matters that are not admitted by the defendant." *Id.* at 34-35.

The government requested that the court impose a sentence calculated under the Guidelines to include the enhancements to which defendant had objected, resulting in a total offense level of 13. *Id.* at 31. The government presented no evidence on either the amount of loss or the foreign location of the crime. It contended that "the use of the phrase 'on or about' that date [in the indictment] doesn't simply limit it to that date . . . use of the

phrase 'on or about' would include any relevant conduct to that particular type of activity." *Id.* at 33.

The court noted that the only thing that Okai "pled guilty to was to counterfeiting on December 16th, 2004 . . . for $800 . . . and it seems to me that's the base offense level." *Id.* at 32. The court further noted that although Okai "confessed to most all of this, but it's not part of count one of the indictment," and that nothing prevented the government "from filing indictments on each one of the counts that he confessed to, but count one is all that he has pled guilty to and count one only is limited to December 16th, 2004." *Id.* Accordingly, the court sustained defendant's objections to the PSR and determined that defendant's base offense level was 9, arriving at a total offense level of 7 after subtracting two levels for acceptance of responsibility. The court determined that OAI's criminal history category was 2 and that his guideline sentencing range was two to eight months. The court sentenced Okai to a term of eight months on Count I.

Count II was set for trial, but defendant filed a petition to enter a plea of guilty to that count as well. See Filing No. 35. Although a PSR was not prepared in connection with that count, both parties agreed to the probation office's calculation that the sentencing range for the offense of possessing false identification documents was one to seven months and that the sentence should be concurrent to the sentence imposed on Count I. Okai was accordingly sentenced to seven months on Count II, to be served concurrently to his sentence on Count I.

## II. DISCUSSION

### A. Sentencing Procedure

6

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court invalidated the United States Sentencing Guidelines ("Guidelines") to the extent that they were applied as mandatory. *Id.* at 764. Accordingly, the Guidelines are advisory and sentences are subject to appellate review for "reasonableness." *Id.* at 757, 765-66 (Breyer, J., opinion of the Court) ("remedial majority opinion"). In imposing a sentence post-*Booker*, this court must follow certain prescribed sentencing procedures. *United States v. Mashek*, 406 F.3d 1012, 1016 n.4 (8th Cir. 2005); *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir. 2005). It must continue to determine the appropriate Guidelines sentencing range, since that range is an important factor to be considered in the imposition of a sentence. *Id.* Once the applicable range is determined, the court should then decide if a traditional departure is appropriate under Part K and/or § 4A1.3 of the Guidelines. *Id.* at 1002. However, "[because the guidelines are now advisory, a reasonable departure is not limited solely to circumstances that the formerly mandatory guidelines framework would have deemed permissible bases for departure." *United States v. Hadash*, 408 F.3d 1080, 1083 (8th Cir. 2005) (stating that *Booker* excised the narrow prescription for when departures are warranted). However, a sentence imposed that includes a formerly permissible departure will be "consistent with the now-advisory Guidelines and this is generally indicative of reasonableness." *United States v. Shannon*, No. 04-2895, Slip op. at 6 (8th Cir. July 14, 2005). Those considerations will result in a "Guidelines sentence." *Haack,* 403 F.3d at 1002.

The court then considers the factors set forth in § 3553(a) to determine whether to impose the Guidelines sentence or a non-Guidelines sentence. *Id.* The court must consider the need for the sentence imposed to reflect the seriousness of the offense, to

7

promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, the court must consider the kinds of sentence available and the applicable category of offenses and category of defendant as set forth in the Guidelines and its policy statements, as well as the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct.  18 U.S.C. § 3553(a)(3)-(6).

The Guidelines range is thus one of many factors for the sentencing court to consider, and although the court is not bound by the Guidelines, it must consult them and take them into account when sentencing.  *Id.* at 767, 790 (Scalia, J., dissenting); *see United States v. Winters*, No. 04-3210, slip op. at 9 (8th Cir. Aug 8, 2005) (noting that reasonableness "must be based on *all* the factors listed in § 3553(a)(6)" and that a possible sentencing disparity, as measured by the Guidelines sentence, must not be isolated "to the exclusion of all the other § 3553(a) factors") (emphasis in original).  Indeed, a finding that "the range of reasonableness is essentially co-extensive with the Guidelines would effectively render the Guidelines mandatory."  *See United States v. Winters*, No 04-3210, slip op. at 6 n.4 (8th Cir. Aug. 8, 2005) (stating that reasonableness is to be determined by the district court in the first instance).

## B.  Determination of Guidelines Range

To satisfy the Sixth Amendment concerns addressed in *Booker*, this court is now charged under the Sentencing Reform Act with the duty to "impose a sentence sufficient,

but not greater than necessary," to comply with sentencing purposes and to "consider the nature and circumstances of the offense and the history and characteristics of the defendant" in determining a reasonable sentence.  *See* 18 U.S.C. § 3553(a)(1).  Nothing in *Booker* requires the court to determine the appropriate Guidelines sentencing range in any manner other than the way the sentence would have been determined pre-*Booker*.[2] *Haack,* 403 F.3d at 1002.  The first step in application of the Guidelines is determining which offense guideline section covers the offense of conviction.  *See* U.S.S.G. § 1B1.2(a); *United States v. Casey*, 158 F.3d 993, 995 (8th Cir. 1998); *United States v. Street*, 66 F.3d 969, 979 (8th Cir.1995).  "The offense guideline section is the foundation of the sentence." *See Casey*, 158 F.3d at 995; *United States v. Saavedra*,148 F.3d 1311, 1314 (11th Cir. 1998).  Because it channels the remainder of the sentencing process, selection of the correct offense guideline section is critically important.  *Casey*, 153 F.3d at 996.

In order to correctly determine the applicable offense guideline, a sentencing court must identify "the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction."  U.S.S.G. § 1B1.2(a); *Casey*, 153 F.3d at 996. *See also United States v. Martinez-Noriega,* 2005 WL 1797506 at *2 (8th Cir. Aug. 8, 2005).  The offense of conviction is defined as "the offense conduct charged in the count of the indictment or information of which the defendant was convicted."  U.S.S.G. § 1B1.2(a); *Casey*, 153 F.3d at 995.  The sentencing court is directed to "use the guideline section from Chapter Two most applicable to the offense of conviction" and advised that "[t]he Statutory Index (Appendix A) provides a listing to assist in this determination."

---

[2]As discussed later in this opinion, *Booker* does not address Fifth Amendment concerns.

9

U.S.S.G. § 1B1.2, comment. (n.1).  That listing cross-references federal statutory offenses to the various guideline sections.[3]  *See* U.S.S.G. App. A.

"'Base offense level' is a term of art used in Chapter Two of the guidelines." *Martinez-Noriega*, 2005 WL 1797506 at *2 (noting that each offense has a corresponding base offense level and may have one or more specific offense characteristics that adjust the offense level upward or downward).  *Id.*  In the plea agreement context, in securing an agreement to be held responsible for a certain base offense level, "a defendant has solidified where he will start in Chapter Two of the guidelines."  *Id.*

There is "one limited exception to the general rule that the offense conduct for guideline purposes is that charged in the indictment: 'Provided, however, in the case of a plea agreement (written or made orally on the record) containing a stipulation that specifically establishes a more serious offense than the offense of conviction, determine the offense guideline section in Chapter Two most applicable to the stipulated offense.'" *Casey,* 153 F.3d at 996 (quoting U.S.S.G. § 1B1.2(a)).  The Commentary following Section 1B1.2. explains, "for example, if the defendant pleads guilty to theft, but admits elements of robbery as part of the plea agreement, the robbery guideline is to be applied," but only to the extent of the maximum sentence for theft.  U.S.S.G. § 1B1.2, comment. (n.3).  "A factual statement or a stipulation contained in a plea agreement (written or made orally on the record) is a stipulation for purposes of [application of the provision that the defendant stipulates to a more serious offense] only if both the defendant and the government explicitly agree that the factual statement or stipulation is a stipulation for such purposes."

---

[3]For example, Okai was charged with violating 18 U.S.C. §§  472 and 1028(a)(6). In Appendix A, those statutes are cross referenced to U.S.S.G. §§ 2B1.1, 2B5.1, 2L2.1 and 2L2.2). *See* U.S.S.G. App. A.

U.S.S.G. § 1B1.2, comment. (n.1).  Thus, "stipulations to additional offenses are treated as if the defendant had been convicted of separate counts charging those offenses." U.S.S.G. § 1B1.2(a); *United States v. Collar*, 904 F.2d 441, 442 (8th Cir. 1990).  The provision, however, has not been interpreted "to mean that whenever a criminal defendant's total criminal conduct includes some acts that would constitute an offense more serious than the offense of conviction, the guideline for the more serious offense may be used."  *See Casey*, 153 F.3d at 996.

The Guidelines articulate several policies that govern the quality and specificity of plea agreements for acceptance by the court.  *See* U.S.S.G. § 6B1.2 (listing standards for acceptance of plea agreement).  The PSR is not evidence and is not legally sufficient for making findings of fact on contested issues. *United States v. Mesner*, 377 F. 849, 853 (8th Cir. 2004) (noting that when "a timely objection to the PSR is made, the sentencing court may not rely solely on the PSR when making a finding as to the disputed facts but must do so on the basis of evidence").

### C.  Constitutional Objections

The Sixth Amendment is violated if a sentencing judge imposes a sentence under the Guidelines based on the determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant.  *United States v. Booker,* 125 S. Ct. 738, 746 (2005) (Stevens, J., opinion of the Court) ("substantive majority opinion") (finding that *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), and *Apprendi v. New Jersey,* 530 U.S. 466, 477 (2000), apply to the United States Sentencing Guidelines).  A defendant, of course, is free to waive his right to a jury trial and to consent to factfinding by the court.  *See Blakely*, 124 S. Ct. at 2541 (noting that "when a defendant pleads guilty,

the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding"); *Duncan v. Louisiana*, 391 U.S. 145, 158 (1968); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). Defendant has done so in this case, so the defendant's right to a jury trial is not at issue.

Rather, the issue before the court is whether, and under what standard of proof, the court can determine facts at sentencing so as not to offend a defendant's Fifth Amendment right to due process.[4] A Fifth Amendment challenge involves a constitutional protection "of surpassing importance: the proscription of any deprivation of liberty without 'due process of law.'" *Apprendi v. New Jersey,* 530 U.S. 466, 477 (2000). It provides that a criminal defendant is entitled to a determination that he is guilty of every element of the crime with which he is charged beyond a reasonable doubt. *Id.* at 477. The entitlement to proof beyond a reasonable doubt is as "equally well-founded" as the right to a jury determination. *Id.* at 478 (noting that "[t]he 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times . . . [and] is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt'" (quoting *In re Winship*, 397 U.S. 358, 361, (1970)). The reliance on the "reasonable doubt" standard reflects a profound judgment about the way in which laws should be enforced and justice administered. *Id.* It has a vital role in

---

[4]The *Booker* decision has been interpreted to establish that "but for the mandatory nature of the Guidelines, fact-findings by the district court will not offend the Sixth Amendment." *United States v. Ryder*, No. 03-3478/79, 2005 WL 1639460 (8th Cir. July 14, 2005). Whether such facts pass muster under the Fifth Amendment is a different question. In *Booker,* the Supreme Court carefully limited its holding to the Sixth Amendment right to jury trial and did not address the requirement of proof beyond a reasonable doubt which has its roots in the Fifth Amendment's Due Process Clause. *See Booker,* 125 S. Ct. at 798 n.6 (Thomas, J., dissenting in part) ("[t]he Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by a jury or admitted by defendant."). *Booker* does not address the due process constraints on sentencing.

our criminal procedure for cogent reasons—prosecution subjects a criminal defendant both to possible loss of liberty and to certain stigma. See *id.* at 484. The procedural protection of a reasonable doubt standard is thus required "in order to 'provide concrete substance for the presumption of innocence,' and to reduce the risk of imposing such deprivations erroneously." *Id.* Indeed, use of the beyond-a-reasonable-doubt standard reflects society's belief that the defendant's interests are so great that the state should bear the risk of error. *See Bullington v. Missouri*, 451 U.S. 430, 440-41 (1981).

The Due Process Clause is implicated whenever a judge determines a fact by a standard lower than "beyond a reasonable doubt" if that factual finding would increase the punishment above the lawful sentence that could have been imposed absent that fact.[5] *Apprendi*, 530 U.S. at 494. To the extent that making the Guidelines advisory obviates Constitutional concerns, there are distinctions to be drawn between Fifth Amendment and Sixth Amendment protections. *See United States v. Pimental*, 367 F. Supp. 2d 143, 152 (D. Mass. 2005) (stating that "even if the Sixth Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process requirement is"). *See also Booker*, 125 S. Ct. at 799 (Thomas, J., concurring in substantive majority opinion, dissenting to remedial majority opinion) (stating that the substantive majority opinion "corrects the [Sentencing Commission's] mistaken belief," set forth in U.S.S.G. § 6A1.3, that "use of a preponderance of the

---

[5]*Cf. United States v. Pirai*, 406 F.3d 543, 551 n.4 (8th Cir. 2005) (en banc) (noting that *Booker* does not require that sentencing judges find sentence-enhancing facts beyond a reasonable doubt). As noted, *Booker's* remedial opinion simply does not involve the Fifth Amendment issue. Moreover, the defendant in *Pirai* had not preserved the issue by raising an *Apprendi* objection. *Id.* at 549.

evidence standard is appropriate to meet due process concerns and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

In *Apprendi*, the Court held that the existence of "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court defined the "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 124 S. Ct. at 2537 (emphasis in original). "The relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.,* 124 S. Ct. at 2537 (emphasis in original). *Blakely* thus broadened *Apprendi* by requiring that "all facts 'which the law makes essential to the punishment'" be subject to constitutional protections. *Blakely*, 124 S. Ct. at 2537 (quoting 1 J. Bishop, Criminal Procedure § 87 (2d ed. 1872)); *see United States v. Malouf*, 2005 WL 1398624 (D. Mass. 2005). Any contention that by making the Guidelines merely advisory, the maximum sentence faced by a defendant again becomes the statutory maximum set forth in the United States Code would contravene *Blakely*. *Blakely,* 124 S. Ct. at 2537; *Ring v. Arizona*, 536 U.S. 584, 602 (2002). Indeed, in *Booker*, use of the modifier "statutory" with reference to "maximum" was abandoned altogether. *See Booker,* 125 S. Ct. at 752 (substantive majority opinion) (explaining that use of the term "statutory maximum" in *Apprendi* was necessitated by the fact that a statute was under consideration in the case).

Under *Apprendi*, the point at which constitutional safeguards attach to a sentence imposed within a broad discretionary range is the point at which the sentence exceeds "the

14

limits fixed by law."  *Apprendi*, 530 U.S. at 566 n.9 (stating that a judge may "not impose a more severe sentence than that authorized by the facts found [beyond a reasonable doubt] by a jury").  Under the advisory Guidelines scheme, a "reasonable sentence," as determined by the interplay of the United States Code, the Sentencing Reform Act, the now-advisory Sentencing Guidelines, and evolving circuit court sentencing directives, now defines "the limits set by law."  It cannot be seriously argued that the Sentencing Guidelines do not continue to have a large, if not determinative, effect on sentencing.  *See Shannon*, No. 04-2895, slip op. at 6 (a departure formerly permissible under the mandatory Guidelines is "generally indicative of reasonableness"); *Haack*, 403 F.3d at 1002 (noting the Guidelines continue to "play a role" in sentencing); *United States v. Mykytiuk,* 2005 WL 1592956 (7th Cir. July 7, 2005) (holding that the Guidelines remain an "essential tool" in sentencing and that a properly calculated Guidelines sentence is entitled to a rebuttable presumption of reasonableness).

In contrast to the pre-Guidelines sentencing regime, a sentencing court's discretion is limited post-*Booker*.  *Compare United States v. Brenneman*, 918 F.2d 745, 746 (8th Cir. 1990) (holding that a sentence imposed within the applicable statutory limits was generally not subject to review on appeal, and would be reviewed only for manifest or gross abuse of discretion such that the severity of the sentence "shocks the judicial conscience"), *with Booker,* 125 S. Ct. at 750 (substantive majority opinion) (noting that no *Apprendi* problem arises when a district judge is bound only by the statutory maximum with no prospect of reversal for imposition of a sentence within that range), and *Booker,* 125 S. Ct. at 765-66 (remedial majority opinion) (prescribing appellate review for reasonableness).  Thus, it remains true after *Blakely* and *Booker* that "a judge's role in sentencing is constrained at

15

its outer limits by *the facts alleged in the indictment* and found by the jury," or by a judge,

with defendant's consent to judicial factfinding.   *See Apprendi*, 430 U.S. at 483 n.10.

A defendant's entry of a plea of guilty and concomitant waiver of a jury trial cannot

correspondingly constitute a waiver of the burden placed on the government to prove its

case.   *See Schriro v. Summerlin*, 124 S. Ct. 2519, 2523 (2004) (finding the jury-trial

guarantee enunciated in *Ring,* 536 U.S. 584, is not retroactive because judicial

determinations made beyond a reasonable doubt are sufficiently reliable); *see also*

*Boykin*, 395 U.S. at 243 (stating that pleading guilty implicates the Fifth Amendment

privilege against self-incrimination, the Sixth Amendment right to confront one's accusers,

and the Sixth Amendment right to trial by jury with no mention of the burden of proof);

*Patterson v. New York*, 432 U.S., at 215, 97 S. Ct. at 2329 ("[A] State must prove every

ingredient of an offense beyond a reasonable doubt and . . . may not shift the burden of

proof to the defendant by presuming that ingredient upon proof of the other elements of

the offense"); *Sandstrom v. Montana,* 442 U.S. 510, 520-524 (1979).   Accordingly, the

burden of proof is not the defendant's to waive:

> [Use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.

*In re Winship*, 397 U.S. 358, 364 (1970) (noting the importance "in a free society that every

individual going about his ordinary affairs have confidence that the Government cannot

adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt

with utmost certainty"); *see also Neder v. United States,* 527 U.S. 1, 11, 13-15 (1991)

(holding that failure to instruct the jury that the State must prove the elements of an offense

16

beyond a reasonable doubt vitiates all the jury's findings whereas a failure to instruct on one element of an offense would not); *Victor v. Nebraska*, 511 U.S. 1 (1994) ("The Due Process Clause requires the government to prove a criminal defendant's guilt beyond a reasonable doubt, and trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires."); *Sullivan v. Louisiana*, 508 U.S. 275, 278, 282-83 (1993) (discussing the relationship between the Fifth and Sixth Amendment and stating that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt;" finding an erroneous burden-of-proof instruction is structural error not subject to harmless error review); *Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991) ("[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense"); *Jackson v. Virginia*, 443 U.S. 307 (1979) (finding the *Winship* doctrine, "establishing so fundamental a substantive constitutional standard, must also require that the factfinder will rationally apply that standard to the facts in evidence")*; Patterson v. New York*, 432 U.S. at 215 (1977) (recognizing a limit on state authority to reallocate traditional burdens of proof).

The difference between an individual's right to a jury and the societal right to an appropriate standard of proof is further illustrated by the difference in the way deprivations of each are treated on appeal and on collateral review. Although a misallocation of factfinding responsibility (judge versus jury) does not warrant retroactive application, *Schriro*, 124 S. Ct. at 2523, the same cannot be said for the retroactivity of application of a preponderance of evidence standard as opposed to a reasonable doubt standard. *See Hankerson v. North Carolina*, 432 U.S. 233 (1977) (giving retroactive effect to rule requiring

17

proof of all elements of crime beyond a reasonable doubt and voiding presumptions that shift the burden of proof to defendant); *Ivan v. City of New York*, 407 U.S. 203, 205 (1972) (holding that the purpose of a reasonable doubt standard is "to overcome an aspect of a criminal trial that impairs the truth-finding function, and *Winship* is thus to be given complete retroactive effect").  Application of a lower standard of proof may be an error that significantly affects factfinding accuracy and undermines society's confidence in the result of the trial.[6]  *See Schiro*, 128 S. Ct. at 2523.

The limits of due process have historically been defined with reference to the line that separates an element of a crime from a sentencing factor.  *See, e.g., Castillo v. United States,* 530 U.S. 120, 124-25 (2000) (finding that references to particular firearm types in gun statute defined a separate crime as opposed to simply authorizing an enhanced penalty and noting that "[t]raditional sentencing factors often involve either characteristics of the offender, such as recidivism, or special features of the manner in which a basic crime was carried out (e.g., that the defendant abused a position of trust or brandished a gun)"; whereas, "the length and severity of an added mandatory sentence that turns on [a fact] weighs in favor of treating such offense-related words as referring to an element").  *See also Mullaney v. Wilbur,* 421 U.S. 684, 698-703 (1975) (finding a due process violation in shifting the burden of proof to defendant to negate a  fact "critical to criminal culpability");  *Booker*, 125 S. Ct. at 755 (substantive majority opinion) (addressing sentencing factor/element distinction and identifying constitutional safeguards as formality of notice,

---

[6]*Schiro* addressed only the allocation of factfinding responsibility between the judge and jury.  *United States v. Siegelbaum*, 359 F. Supp. 2d 1104, 1107 (D. Or. 2005).  There is a second component to *Blakely/Booker* that *Schiro* did not address, namely, that facts used to enhance a sentence, if not admitted, must be proven beyond a reasonable doubt rather than by a preponderance the evidence.  *Id.*

18

identity of factfinder and the burden of proof); *Blakely,* 124 S. Ct. 2537 n.5; *Apprendi,* 530 U.S. at 494; *Harris v. United States,* 536 U.S. at 552-53 (2002); *Jones v. United States,* 526 U.S. 227, 233 (1999) (explaining that it is "at best questionable whether the specification of facts sufficient to increase a penalty by two-thirds, let alone from 15 years to life, was meant to carry none of the due process safeguards that elements of an offense bring with them for a defendant's benefit"); *United States v. Harris*, 397 F.3d 404, 413 (6th Cir. 2005) (finding that judicial determination of the type of firearm for an enhancement under 18 U.S.C. § 924(c) violates the constitution).  Even with respect to the traditional sentencing factor of a prior conviction, a sentencing court can only rely on the prior convictions as predicates for an increased sentence if the characteristics of these convictions are evidenced by "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."  *United States v. Shepard*, 125 S. Ct. 1254, 1257 (2005) (rejecting contention that sentencing court could look at police reports to determine nature of prior conviction).

Whether characterized as "elements" or not, certain facts, such as drug quantity, scope of the operation, amount of loss, or injury are as important to the sentence as the general elements of a crime set out in the criminal code.  See, e.g., *United States v. Malouf*, 2005 WL 1398624 at *11.  Moreover, these are factors that typically relate to the offense rather than to characteristics of the offender.  *See id.*  Even under the advisory Guidelines, some facts will be determinative in that they drive the calculation of the base offense level.  *See id.* (noting that in drug prosecutions, "quantity is all, despite the fact that it may well depend on variables that have nothing to do with the real scope of the offense,

or defendant's role in it (e.g., how long the government happened to have surveilled the defendant, how explicit a co-defendant was about amounts, etc.)").

These facts "figure so prominently in the sentencing decision that the decisionmaker should have a high degree of confidence in the fact." *Id.*; *United States v. Gray*, 362 F. Supp.2d 714, 723 (S.D. W. Va. 2005) ("As a tool for reducing the risk of error, reasonable doubt retains its usefulness in the advisory regime.").  Under the circumstances, the court finds that it should err on the side of caution in protecting a criminal defendant's constitutional rights.  The principal of constitutional avoidance mandates that the federal sentencing statutes should be construed to avoid the difficult constitutional question of whether the imposition of a harsher sentence—whether characterized as a Guidelines sentence, a departure, or a deviance—violates due process when the greater punishment is based on facts found under a standard lower than proof beyond a reasonable doubt. *See Clark v. Suarez-Martinez*, 125 S. Ct. 716, 724 (2005) (a court should construe a statute to avoid a constitutional infirmity if possible).  Moreover, whatever the constitutional limitations on the advisory sentencing scheme, the court finds that it is not "reasonable" to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt.  S*ee Ring v. Arizona,* 536 U.S. 584, 592-93 and n.1 (2002) (holding that any fact essential to imposition of the death penalty must be submitted to a jury and found beyond a reasonable doubt); *Apprendi,* 530 U.S. at 477 (2000) (finding a sentence violates the right to "a jury determination that [the defendant] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); *Jones v. United States*, 526 U.S. at 243 n.6 (1999) (holding that the carjacking statute, if construed as defining a single crime with three maximum penalties instead of three distinct offenses

20

would violate the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment).

### D.  Application to this Case

In determining the appropriate guideline range in this type of case, the determination of amount of loss is a critical determination.  The base offense level for a counterfeiting crime gradually increases by the amount of financial loss attributable to the defendant.  U.S.S.G. § 2B1.1(b)(1).  This determination must be made in the first instance by facts either admitted by defendant or proven beyond a reasonable doubt.

Generally, the amount of loss to be considered is the defendant's intended, rather than actual, loss, if an intended loss can be determined, and if the intended loss exceeds the amount of actual loss. U.S.S.G. § 2B1.1 comment. n.3(A).  To calculate intended loss, the district court is to make only a reasonable estimate of the loss, in consideration of the sentencing judge's "unique position to assess the evidence and estimate the loss based on that evidence."  U.S.S.G. § 2B1.1 comment. n. 3(C).

Notably, the indictment did not allege any conspiracy or scheme to defraud.  The offense with which Okai was charged, does not have a scheme, conspiracy, or pattern of criminal activity as an element.  *See* 18 U.S.C. § 472; *see also United States v.  Fogg*, 409 F.3d 1022, 1028 (8th Cir. 2005) (involving restitution).  The indictment alleged, and defendant admitted, that he passed counterfeit currency on one occasion.  Okai admitted in the plea colloquy that the amount of currency he passed on that occasion was less than $1,000.  He disputed the government's contention that it had evidence of additional losses.  He disputed the findings in the PSR.  The government failed to present any evidence with respect to the controverted facts.

21

The court finds that Okai cannot be sentenced, consistent with due process, to a term of imprisonment for causing an amount of loss that exceeds the extent of the indictment and his admissions.[7]  In the related context of restitution, unless the charged offense has a scheme, conspiracy, or pattern of criminal activity as an element, the restitution order may only cover losses from the specific offense for which the defendant was indicted and convicted. *United States v. Ramirez*, 196 F.3d 895, 899-900 (8th Cir. 1999).  Accordingly, the court sustains defendant's objections to the PSR and finds that defendant's advisory guideline sentence is limited to the sentence that can be imposed based on facts alleged in the indictment, proved beyond a reasonable doubt or admitted by defendant.

The court will next determine whether the sentence is reasonable under *Booker's* remedial scheme, mindful that "[i]n fulfilling its duty to impose a sentence sufficient, but not greater than necessary, to comply with sentencing purposes," the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  *See* 18 U.S.C. § 3553(a)(1); *see also Booker*, 125 S. Ct. at 766-67 (remedial majority opinion).  The court has considered the need for the sentence imposed: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant

---

[7]Eighth Circuit precedent does not mandate a contrary result.  *See United States v. Crawford*, 414 F.3d 980 (8th Cir. 2005) (affirming a twelve-level enhancement for amount of loss as based on admitted facts); *United States v. Radke*, 415 F.3d 826 (8th Cir. 2005) (affirming an amount of loss reasonably foreseeable to acts of co-workers in furthering a scheme to defraud); *United States v. Carter*, 412 F.3d 864 (8th Cir. 2005) (affirming loss determination under plain error review); *United States v. Parsons*, 408 F.3d 519, 521 (8th Cir. 2005) (affirming twelve-level enhancement for amount of loss where defendant admitted amount in plea agreement).  Significantly, none of these cases involves a properly preserved Fifth Amendment challenge involving disputed facts.

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). In addition, the court has considered, as advisory, the kinds of sentence available and the applicable category of offenses and category of defendant as set forth in the United States Sentencing Guidelines, and any policy statements promulgated thereto. 18 U.S.C. § 3553(a)(2). Also, the court has considered the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(6) & (7). These factors can generally be grouped into three categories: the nature of the offense; the history of the defendant; and the needs of the public and victims. As noted above, the court has consulted the Guidelines and has determined that defendant's Guidelines sentence should be eight months.

The court also notes that the defendant will likely be deported. The court's experience is that the deportation process will likely take an additional six to eight months from the date of his Bureau of Prisons release, during which time the defendant will remain incarcerated. Given the totality of the circumstances, the court finds this sentence will fulfill the objectives noted above.

A Statement of Reasons and Judgment and Conviction in conformity with this Memorandum Opinion will issue this date.

DATED this 22nd day of August, 2005.

BY THE COURT:


s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
United States District Judge

23